Chief Alma **RANSOM**, Chief Hilda Smoke, and Chief Paul Thompson Plaintiffs,

v.

Bruce **BABBITT**, et al., Defendants.

No. CIV.A. 98–1422(CKK).

United States District Court, District of Columbia.

Sept. 30, 1999.

---

142

Bradley Stuart Waterman, Peter Bushfield Work, Crowell & Moring, L.L.P., Washington, D.C., for Plaintiff.

Lisa Barsoomian, Mark Nagle, United States Attorney's Office, Washington, D.C., John H. Harrington, U.S. Dept. of the Interior, Office of the Solicitor, Atlanta, GA, for Defendant.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

In 1995, for the first time in almost 200 years, the Saint Regis Mohawk Tribe exchanged their Three Chief System of government for a constitutional one composed of three branches. The process by which this exchange took place, and the Tribe's subsequent attempts to revoke that constitutional system and to reinstate the former governing structure, provide the material for this lawsuit.

Plaintiffs invoke this Court's jurisdiction pursuant to 5 U.S.C. § 551 *et seq.* (the "Administrative Procedure Act" or "APA"), and 28 U.S.C. §§ 1331 and 1361. Plaintiffs, Chiefs Alma Ransom, Hilda Smoke and Paul Thompson, assert that they comprise the Three Chief System Tribal Council, the governing body of the Saint Regis Mohawk Tribe ("the Tribe"). Defendants are all agents of the federal government responsible for conducting relations with Indian nations located within the United States. In Plaintiffs' view, Defendants Bureau of Indian Affairs ("BIA" or the "Bureau") and the Interior Board of Indian Appeals ("IBIA") have acted contrary to federal law and in an arbitrary

and capricious manner in failing to recognize the Three Chief System Tribal Council as the legitimate government of the Saint Regis Mohawk Tribe.

Before the Court are three motions: Plaintiffs' Motion for Summary Judgment, Defendants' Motion for Summary Judgment, and Defendants' Motion for Leave to File an Amended Answer. After careful review of the record and the parties' briefs, the Court grants Plaintiffs' Motion and denies both of Defendants' Motions. The Court finds that Defendants acted arbitrarily, capriciously, and contrary to law in refusing to review for themselves the intensely disputed tribal procedures surrounding the adoption of a tribal constitution, in crediting unreasonable decisions of a seemingly invalid tribal court, and in refusing to grant official recognition to the clear will of the Tribe's people with regard to their government. Moreover, the Court finds untimely and unpersuasive Defendants' belated attempt to amend their answer, initiated only at the final stages of briefing in this case.

## I. BACKGROUND

At the heart of this case is the Saint Regis Mohawk Tribe's right to self-determination, and the obligation borne by the federal government to recognize that self-determination. From 1802 until 1995, when the disputed circumstances arose, the Tribe operated under a Three Chief System of government whereby three Chiefs, elected by Mohawk voters, together acted as the Tribe's governing body for staggered, three-year terms. *See* Compl. ¶ 12; Pl's Mot. Summ. J. at 4.

### A. *The first referendum*

The events animating this litigation began on June 3, 1995, when the Tribe conducted a referendum election to determine whether it would adopt a Tribal Constitution creating three branches of tribal government (executive, judicial, and legisla-

tive), and supplanting the Three Chief System. This Constitution provided for its own adoption "upon certification that fifty-one (51%) of those present and voting in the referendum called on June 03, 1995 have voted in favor of adopting the Constitution of the Saint Regis Mohawk Tribe." Administrative Record ("A.R.") at vol. I, tab 3 (Draft Tribal Constitution, Art. XIX). On June 6, 1995, witnessed by the then-presiding Three Chiefs, the Tribal Clerk Carol T. Herne certified that 463 out of 909 valid ballots supported the ratification of the constitution—a total of 50.935093% of the vote.[1] *See* A.R. at vol. I, tab 5.

Although extremely close, the results of this referendum election suggested that the Tribal Constitution question failed. Yet shortly following the vote, the Tribal Clerk certified, and the Three Chiefs witnessed, that "a majority of those present and casting valid ballots voted in favor of adopting the tribal constitution....." *Id.* She further certified "that the proposed tribal constitution is adopted by a majority of the Mohawk people." *Id.* The critical, though barely perceptible, difference between the actual results of the referendum election and the requisite 51% set in motion several years of tribal division, a deprivation of services to the Saint Regis Mohawk people, and ultimately this civil action.

After certifying both the referendum results and the adoption of the Tribal Constitution, the existing Chiefs proceeded to govern as the Tribal Legislative Council under a constitutional structure. *See* Compl. ¶ 13. The dubious circumstances surrounding the adoption of the Constitution, however, occasioned persistent debate within the Tribe over the ensuing months. *See id.* ¶ 14. Hence, on May 23, 1996, in response to a petition signed by at least 20% of the Tribe's eligible voters requesting it to do so, the new Legislative Council added a referendum question to the ballot

---

1. This is the count most favorable to proponents of the draft Constitution. Calculations including voided ballots and ballots that a voter picked up but never returned only lower the percentage in favor of ratification. *See* A.R. at vol. I, tab 5.

for the June 1, 1996 election of Tribal officers under the putative new Constitution. *See* A.R. at vol. I, tab 10. Recognizing that "questions have been raised as to the proper adoption procedure" of the Constitution, the Council appended to the ballot the question, "Is the Tribal Constitution of the Saint Regis Mohawk Tribe valid?" *Id.; See also* Pl.'s Stmt. Mat. Facts ("108(h) Stmt.").

### B. *The second referendum*

The results of this ballot question decisively repudiated the Three Chiefs' certification that the constitution was adopted—651 votes indicating that the Constitution was invalid, against 339 votes indicating that the Tribe properly adopted the Constitution. *See* A.R. at vol. I, tab 11. In response to the ballot question and to continuing strife within the Tribe, on June 10, 1996 Tribal leaders acting as the Legislative Council passed Tribal Council Resolution ("TCR") 96–84, rescinding the erroneous certification of the Constitution, confirming that the Tribe had rejected the proposed Constitution, and reverting tribal governance to the Three Chiefs System. *See* A.R. at vol. I, tab 11; Pls.' 108(h) Stmt. ¶ 11. The same day, the Tribal Council also approved TCR 96–85, in which it called "a referendum to be conducted on June 15, 1996," and in which it "agree[d] to abide by the results of the same," posing the question, "Do you favor continuing with our present elected officials?" A.R. at vol. I, tab 13.

### C. *The third referendum*

This so-called "clean slate" referendum question, a further response by the Tribal Council to the ongoing discord within the Tribe that ensued from the disputed certification of the Constitution, proposed two possible courses of action depending upon the outcome of the referendum. If the Tribe voted to retain the current officials, then these would remain as the Three Chief System Tribal Council. *See id.* If

the Tribe voted for a clean slate of officials, it would hold a nominating caucus on June 22, 1996 with elections on June 29, 1996. *See id.* The referendum resulted in clean slate elections, with 481 votes in favor of new elections, and 194 votes in favor of retaining the existing Tribal Council. *See* A.R. at vol. I, tab 15; Compl. ¶¶ 16–17.

Following the nomination caucus, the Tribe held elections on June 29, 1996. The Tribe selected as its Three Chiefs System Tribal Council Chiefs Alma Ransom, Hilda Smoke and Paul O. Thompson, Plaintiffs in this case, along with Sub-Chiefs Barbara Lazore, Bryan Garrow and John Bigtree, Jr. *See* Pls.' Mot. Summ. J., Ex. 8. After the election, Chiefs Ransom, Smoke, and Thompson (the "Three Chiefs Government") contacted the BIA in order to have the Bureau recognize them as the newly elected government of the Tribe. *See* Compl. ¶ 19. But the BIA, through Defendant Franklin Keel, then the Acting Eastern Area Director, declined to recognize the Three Chiefs Government. Instead, the agency indicated that it considered the incumbent members of the Tribal government, the Tribal Council envisioned by the putative Constitution, to comprise the rightfully governing body of the Tribe.

> The recognized leaders of the tribe [elected on June 1, 1996] are as follows: Edward Smoke—chief and CEO; Carol Herne—tribal clerk; Rosalie Jacobs—vice chief; Philip Tarbell—tribal council member; Hilda Smoke—tribal council member; Alan White—tribal council member; Doug Smoke—tribal council member, and Carol Ross—tribal council member. Only the aforementioned persons are recognized as possessing authority to represent the tribe in government-to-government relations with the United States.

A.R. at vol. I, tab 34.[2]

The Bureau based its recognition of the Constitutional Government upon two deci-

---

2. Defendants recognized officers and titles provided for under the purported Tribal Constitution which even the "Constitutional" government office holders no longer used. In TCR 96–85, for example, they noted that even

sions issued by temporary Judge Christine Z. Deom of the purported Saint Regis Mohawk Tribal Court.[3] *See id.* These opinions, *Lazore v. Saint Regis Mohawk Tribal Council,* Case No. 96–CI–10080 (June 7, 1996) (*"Lazore I "*), see A.R. at vol. I, tab 12, and *Lazore v. Saint Regis Mohawk Tribal Council,* Case No. 96–CI–10080 (July 12, 1996) (*"Lazore II "*), *see* A.R. at vol. I, tab 29, affirmed the legitimacy of the Tribal Constitution and called into question all subsequent actions taken to rescind that constitution. In *Lazore I,* Judge Deom ruled that the referendum questioning the validity of the adopted Constitution was advisory only, and was, moreover, itself unconstitutional.[4] *See* A.R. at vol. 1, tab 12. In response to this ruling, the Tribal Council formally rescinded its certification of the Constitution and reverted to the Three Chiefs System of government. *See* A.R. at vol. I, tab 11. That rescission provoked *Lazore II.* In her second opinion, Judge Deom held unconstitutional the Council's attempt to rescind its certification of the Constitution; found all of the Council's actions regarding the

"clean slate" referendum and the new elections to be null and void; declared the Tribal Constitution operative until properly amended or repealed; and enjoined the Three Chiefs Government from assuming any authority. *See* A.R. at vol. 1, tab 29. Emphasizing the extraordinary nature of a constitution, Judge Deom wrote that "[c]ertification of the adoption of a tribal constitution is a special confirming act of the will of the people and thus may not be subsequently rescinded like other legislative acts."[5] *Id.* She further stated that "[o]nce adopted, only a sufficient number of people can change or repeal the tribal constitution using only those methods permitted by the tribal constitution itself.... This amendment requirement cannot be understated or treated in as cavalier a fashion [as the Tribal Council has in decertifying its adoption]." *Id.*

On August 2, 1996, the Three Chiefs Government filed with the IBIA an appeal of the Acting Eastern Area Director's determination not to recognize that body's authority. *See* A.R. at vol. II.[6] The IBIA docketed the Three Chiefs Government's

---

if the "clean slate" ballot question failed, the Tribe would still operate under the old Three Chiefs System.

3. This Tribal Court represented another facet, indeed one of the three branches, of the government instituted under the now-defunct Constitution. Plaintiffs contend, with what appears to be good reason, that the Tribal Court rulings were invalid because Judge Christine Deom acted without the appropriate authority. First, Judge Deom is not a member of the Tribe and does not meet the requirements for judges as elaborated in the constitution under which her court purportedly operates. *See* Compl. ¶ 20; Pl.'s Mem. Supp. Mot. Summ. J., Ex. 12 (Judge Deom's résumé). Second, the temporary appointment of Judge Deom appears to have expired prior to her second ruling. *See* Compl. ¶ 20; A.R. at vol. I, tab 6 (TCR 95–219B, the resolution temporarily appointing Judge Deom until no later than June 30, 1996). It is unnecessary at this point for this Court to resolve the question of Judge Deom's judicial authority; it will suffice merely to examine the authority of the Tribal Court and the validity of the premise upon which Judge Deom and the Tribal Court operated. *See* A.R. at vol. I, tab 6 (TCR 95–219B, stating that

"there is a need to implement the Constitutional requirement for a Tribal Court under the authority of the Judicial Branch (Article I) of the Tribal Constitution.")

4. Because the Tribal Constitution required at least a 30% voter turnout on a referendum to repeal or amend the document, and because 30% of the Tribe did not vote during the June 1, 1996 elections, the Tribal Court held that the ballot question regarding the validity of the Constitution could have no practical or legal effect. *Id.*

5. Of course, Judge Deom's logic here betrays a certain irony, since the original dispute addressed precisely whether or not the adoption of that Constitution was improper. Thus to insist that because a constitution embodies "the will of the people" it cannot be lightly rescinded was to miss the increasingly forceful indications that, while its *rescission* did represent the will of the Tribal members, the *Constitution itself* actually violated their will.

6. Defendants' Administrative Record lacks page numbers throughout, and volumes II and III also lack tabs dividing documents.

appeal and summarily affirmed the BIA's July 26 determinations.[7] *See Smoke v. Acting Eastern Area Director,* 30 IBIA 31 (Sept. 24, 1996) (*"Smoke I"*); A.R. at vol. I, tab 42. Echoing Defendant Keel's emphasis on principles of tribal sovereignty and self-determination, the IBIA affirmed Keel's statement regarding the legitimacy of the Tribal Court, and the necessity to exhaust tribal remedies before seeking external review. *See id.* at 32–33. In particular, the IBIA held that the dispute in question, the validity of the Judge Deom's rulings, should be presented to a tribal forum, not to the BIA *or* the IBIA. *See id.* at 33. Responding to the Three Chief Government's claim that Tribal Court remedies were unavailable to the extent that those courts and their judges were without authority, the IBIA pronounced that "[i]t is for a tribal forum, not BIA or this Board, to decide whether the tribal judge acted under valid tribal authority." *Id.* at 34.

According to the Three Chiefs Government, however, the Tribal Courts were not only invalid, but were also non-functional. It therefore requested that the IBIA reconsider its September 24 order. *See Smoke v. Action Eastern Area Director,* 30 IBIA 90 (Oct. 31, 1996) (*"Smoke II"*); A.R. at vol. II. Once again, the IBIA maintained that the question of the validity of the Tribal Court rested with the Tribe itself. *See Smoke II,* 30 IBIA at 91. The IBIA acknowledged that, "[a]ssuming the tribal court remains inactive, an identification of the appropriate forum in which to challenge the earlier tribal court orders will undoubtedly be more difficult. However, as the Supreme Court has stated, '[n]onjudicial tribal institutions have also been recognized as competent law-applying bodies.'" *Smoke II,* 30 IBIA 90–91 (quoting *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 66, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)). Disavowing jurisdiction over the issues before it, the IBIA cautioned that "[t]he fact that the tribal court is presently inactive does not provide a basis for the Board to assume authority over the fundamental tribal questions [Plaintiffs raise].... Those questions belong in a tribal forum, whether that forum is judicial or nonjudicial." *Smoke II,* 30 IBIA at 91.

### D. *The fourth referendum*

In response to this decision, the Three Chiefs Government posed the question of the Tribal Court's validity to the ultimate non-judicial tribal forum—the members of the Tribe. *See* A.R. at vol. I, tab 43 (TCR 96–56). This referendum question, the preamble to which chronicled the history of the contested Constitution, asked: "Did the Judiciary of the Saint Regis Mohawk Tribe act under valid Tribal authority?" *Id.* The November 30, 1996 referendum election yielded a vote of 17 in support of the Tribal Court's validity, and 394 suggesting that the Court was without legal authority. *See* A.R. at vol. II.

Once again, though, the BIA—through New York Field Representative Dean White—questioned the validity of the November 30 referendum. *See* A.R. at vol. I, tab 55; Defs.' 108(h) Stmt. ¶ 28. Notwithstanding an assurance by the Tribal Clerk that the Tribe conducted the referendum in compliance with all applicable procedures, *see* A.R. at vol. II, the BIA reaffirmed its previous position as elaborated by Defendant Keel. *See* A.R. at Vol. I, tab 55. White emphasized that the BIA's reigning principles of tribal self-determination and self-government prevented it from interfering with the Saint Regis Mohawk's leadership disputes. *See id.* In essence, the BIA reiterated its recognition of the Tribal Constitution and the Constitutional Government as the Tribe's legitimate governing structure. *See id.*

The Three Chiefs Government appealed Mr. White's decision to Eastern Area Director Keel, *see* A.R. at vol. I, tab 65, but Keel affirmed, restating the BIA's position that the Three Chiefs Government must

---

7. The IBIA was dissatisfied with the Three Chief Government's response to its order to show cause why the IBIA should not summarily affirm the BIA.

raise its challenges to the Constitutional Government's authority in a tribal forum. *See id.* Once again, Keel's letter did not give any weight to the Tribal referendum denouncing the authority of the Tribal Courts. *See id.* Yet both the Constitutional government and the Three Chiefs Government, despite their fundamental political disagreements, had endorsed a joint resolution, TCR 97–A–1, in which they attempted to impress upon the BIA the value of Tribal referendums. *See* Compl. ¶ 26. This resolution, jointly prepared, asserted that "the governing bodies reaffirm that public referendums have historically been the voice of the people and their results are final and legally binding." *See* Compl. ¶ 26; Pl.'s Mem. Supp. Summ. J., Ex. 22. This last effort, like those before, failed to move the BIA. *See* Compl. ¶¶ 27–29.

The final round of procedural wrangling between the Three Chiefs Government and the BIA occurred in the wake of the Tribe's June 7, 1997 elections. *See* Defs.' Mot. Summ. J. at 15–16. In an apparent attempt to bring a temporary semblance of order to tribal governance, members of the Three Chiefs Government ran for and won a majority of the seats on the Constitutional Tribal Council. *See id.* at 15; Pls.' June 23, 1999 Status Rep. at 3 ("Pls.' Status Rep."). While the BIA views this action on Plaintiffs' part as having mooted the Tribe's governance disputes, *see* Defs.' Mot. Summ. J. at 15–16, Plaintiffs adamantly disagree. *See* Pls.' Status Rep. at 3. Plaintiffs assert that "[g]iven the BIA's refusal to recognize the form of government and the governmental representatives chosen by the Tribe, the Tribe has had to maintain a 'Constitutional' government, in addition to its Three Chief System government, in order, *inter alia,* to have a conduit through which to receive federal funds." *Id.*

As a result of the 1997 elections, the BIA requested that the IBIA dismiss as moot the Three Chiefs' appeal of Defendant Keel's May 2 determination, *Smoke v. Eastern Area Director ("Smoke III")*. *See* Defs.' Mot. Summ. J. at 15. For a different reason altogether, Plaintiffs agreed that the issue was moot, since feuding Tribal factions had just agreed that its referenda represented the traditional, and therefore decisive, voice of the Tribe. Accordingly, the IBIA dismissed the case as moot. *See Smoke III,* 31 IBIA 99 (July 31, 1997). The Three Chiefs Government later moved to reinstate the appeal, but the IBIA denied the request, noting that even if they reinstated the appeal, "the Board would not have authority to grant the relief requested by [the Three Chiefs Government]." *Smoke III,* 31 IBIA 121 (Sept. 4, 1997). While the IBIA understood the "dispute" at issue in this appeal as one internal to the Tribe, and therefore resolved by the final referendum, Plaintiffs maintained that the real lingering dispute involved the relationship between the BIA and the Tribe. *See* Pls.' Mem. Supp. Mot. Summ. J. at 5 ("Mr. Keel's astonishing declaration gave rise to a new dispute— but not an internal Tribal governance dispute, as the first dispute had been. Rather, the new dispute was a dispute *between the BIA and the Tribe* that Mr. Keel created and that Mr. Keel has perpetuated to this day."(emphasis in original)). In their view, the sole issue left unresolved after the series of referenda and unsuccessful appeals to the BIA and the IBIA is whether and how the Tribe may effectively self-govern, while retaining recognition by the federal government. Subsequent to this final denial of their appeal, Plaintiffs filed this suit.

Both parties have filed Motions for Summary Judgment that are now before the Court. Defendants also moved to amend their answer. For the reasons expressed below, the Court grants Plaintiffs' Motion for Summary Judgment, and denies both of Defendants' Motions.

## II. DISCUSSION

A. *Defendants' Motion to amend their answer is untimely.*

■ On the very day that the parties filed their final round of briefs in this case, Defendants moved to amend their answer

pursuant to Federal Rule of Civil Procedure 15(a). The purpose of this motion was to incorporate an affirmative defense of failure to join a necessary or indispensable party. Pursuant to Rule 19(a), the Court must first ascertain if a person subject to service of process is, in fact, a necessary or indispensable party to the case. Rule 19(b) next requires the Court to determine whether it may, in equity and good conscience, proceed with a case if a necessary party cannot be joined. The timeliness requirements of Rule 12(h) counsel that "[i]n federal procedure, failure to join necessary parties is waived if objection is not made in defendant's first responsive pleading; it is only the absence of an indispensable party which may (possibly) be raised later." *Citibank, N.A. v. Oxford Properties & Finance Ltd.,* 688 F.2d 1259, 1263, n. 4 (9th Cir.1982);

Here, Defendants have not raised the issue of a necessary party in a timely fashion. In fact, in their October 14, 1998 statement to the Court pursuant to Local Rule 206, they explicitly declared: "Defendants do not believe that other persons need to be joined to this action." Defs.' Meet & Confer Stmt.. at 3. Having failed to raise the issue at an appropriate stage of this litigation, Defendants may not now seek to have this case dismissed for Plaintiffs' failure to join the Constitutional Government in this action. *See Citibank,* 688 F.2d at 1262.

■ Timeliness notwithstanding, the Constitutional Government is not an indispensable party to this litigation. For instance, "[i]n cases where plaintiffs have challenged the propriety of decisionmaking by federal administrative agencies, courts frequently have concluded that states and municipalities affected by that decisionmaking are not indispensable parties." *Coalition on Sensible Transportation Inc., v. Dole,* 631 F.Supp. 1382, 1387 (D.D.C. 1986). In a case evaluating whether or not non-party Indian tribes that are beneficiaries of a fund needed to be joined in a case involving that fund, this Circuit wrote that "[i]f the nonparties' interests are adequate-

ly represented by a party, the suit will not impede or impair the nonparties' interests, and therefore the nonparties will not be considered 'necessary.'" *Ramah Navajo School Bd. v. Babbitt,* 87 F.3d 1338, 1351 (D.C.Cir.1996). While the Constitutional Government might be affected by this Court's review of BIA's actions, their joinder remains unnecessary for the Court to conduct its review. *See Coalition on Sensible Transportation,* 631 F.Supp. at 1387. Further, whatever interests the Constitutional Government might have in this case will find adequate representation by Defendants. *See Ramah Navajo School Bd.,* 87 F.3d at 1351. Finally, as Plaintiffs have argued in their Opposition to this Motion, "the 'Constitutional government'—which only exists because of Defendant's [sic] admitted refusal to provide federal funds to any other entity on the reservation and includes as its leaders the Plaintiffs in this matter—have taken no interest in this proceeding." Pl.'s Opp. Defs.' Mot. Amend Answer at 6.

B. *The Mandamus and Venue Act is unnecessary to decide this case.*

The Mandamus and Venue Act of 1962, Pub. Law 87–748, codified in 28 U.S.C. § 1361 (the "Mandamus Act"), states that "[t]he district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." This Circuit has held that Congress enacted section 1361 in order to fill a void "which previously had been taken to prevent District Courts outside the District of Columbia from issuing mandamus against a government official." *Peoples v. U.S. Department of Agriculture,* 427 F.2d 561, 565 (D.C.Cir.1970). Rather than create new jurisdiction, section 1361 simply extended to other district courts the ability to entertain certain civil actions under the Administrative Procedure Act. *See id.* "[The] statute does not undercut the historic jurisdiction of the District Court for the District of Columbia to entertain such actions." *Id.*

■ A particular case must meet specific criteria before a district court may order mandamus under section 1361. *See Whittle v. Moschella,* 756 F.Supp. 589, 596 (D.D.C.1991). "To be entitled to the extraordinary remedy of a writ of mandamus, a plaintiff must have a clear right to relief, and there must be no adequate alternative remedy." *Id.* (citing *Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 34, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980); *Council of and for the Blind v. Regan,* 709 F.2d 1521, 1533 (D.C.Cir.1983) (*en banc* )). If the alternative remedy existing for the plaintiff is either judicial or administrative, courts generally will deny mandamus. *See Association of Am. Med. Colleges v. Califano,* 569 F.2d 101, 111 (D.C.Cir.1977) (*citing Haneke v. Secretary of HEW,* 535 F.2d 1291, 1296 (D.C.Cir.1976)).

With or without the Mandamus Act, Plaintiffs are entitled to bring this case in this Court. *See Peoples,* 427 F.2d at 565. An adequate remedy is available to Plaintiffs through the Administrative Procedure Act, and venue lies here because defendant Department of the Interior is located in the District of Columbia. Because the Court can afford Plaintiffs this remedy without ordering mandamus, and because Plaintiffs need not invoke the Mandamus Act in order to justify venue here, the Court declines to decide this case under its section 1361 authority.[8] *See Whittle,* 756 F.Supp. at 596.

D. *Defendants' actions with regard to the Tribe's governance disputes have been arbitrary, capricious, and contrary to law.*

The Administrative Procedure Act empowers this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.". 5 U.S.C. § 706(2)(A). Although the judiciary bears the responsibility under the APA to set aside agency decisions that meet this description, *see MD Pharmaceutical, Inc. v. Drug Enforcement Admin.,* 133 F.3d 8, 16 (D.C.Cir.1998), "[t]he scope of review under the 'arbitrary and capricious standard' is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Nonetheless, this Circuit has held that "where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, we must undo its action." *Petroleum Communications, Inc. v. F.C.C.,* 22 F.3d 1164, 1172 (D.C.Cir.1994) (citing *American Tel. & Tel. Co. v. F.C.C.,* 974 F.2d 1351 (D.C.Cir.1992)). So long as there are no genuine issues of material facts in dispute, a party is entitled to summary judgment if she is entitled to judgment as a matter of law. *See Tao v. Freeh,* 27 F.3d 635, 638 (D.C.Cir.1994).

The roots of the concept of tribal sovereignty and self-determination reach back at least to the Constitution itself. *See e.g.,* U.S. Const. art. I, § 8, cl. 3 (granting Congress the power "[t]o regulate Commerce with foreign Nations, and among the several states, and with the Indian Tribes."). In 1831, the Supreme Court noted that even before the United States entered into treaties with Indian tribes formalizing relations, these tribes were distinct organizations capable of self-gov-

---

**8.** Defendants also suggest that the political question doctrine deprives this Court of subject matter jurisdiction. Since the Court decides this case only under the jurisdiction afforded it by the APA, it cannot issue an order compelling a certain form of government upon the Saint Regis Mohawk Tribe. What remains is a matter of evaluating agency action as it regards the Tribe's government. "The political question doctrine does not preclude the Court from resolving issues that may be otherwise properly raised, merely because the personal motivations of those raising the issues may be political in nature." *Harjo v. Kleppe,* 420 F.Supp. 1110, 1116 (D.D.C.1976), *aff'd sub nom.,* 581 F.2d 949 (D.C.Cir.1978). Clearly an APA review is not a governmental function that the Constitution commits to a coordinate branch of the federal government. Thus, the political question doctrine does not remove subject matter jurisdiction from this Court.

ernment. *See Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 16, 8 L.Ed. 25 (1831).

Supreme Court jurisprudence has recognized the right to self-government as a fundamental aspect of tribal existence.[9] *See e.g., White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 142–45, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980); *Wheeler v. U.S. Department of Interior,* 811 F.2d 549, 551 (10th Cir.1987). This Court also has noted that the right to self-government remains a key to tribal identity and federal-tribal relations. *See Harjo,* 420 F.Supp. at 1143. In *Harjo,* the Court dealt with a challenge to the United States' recognition of certain governmental entities within the Creek Nation. *See id.* at 1114. Acknowledging that federal policy had long undermined many of the promises made to various Indian tribes, the Court emphasized that "the essence of those promises, that the tribe has the right to determine its own destiny, remains binding upon the United States, and federal policy in fact now recognizes self-determination as the guiding principle of Indian relations." *Id.* at 1143.

■ In situations of federal-tribal government interaction where the federal government must decide what tribal entity to recognize as the government, it must do so in harmony with the principles of tribal self-determination. *See Wheeler,* 811 F.2d at 552. The *Wheeler* court wrote that, even when determining which tribal group the federal government should recognize, "the Supreme Court has stated that '[a]mbiguities in federal law have been construed generously in order to comport with . . . traditional notions of sovereignty and with the federal policy of encouraging tribal independence.' " *Id.* (citing *Bracker,* 448 U.S. at 143–44, 100 S.Ct. 2578).

Like the Defendants, courts take care not to intervene into internal tribal affairs. The *Harjo* court wrote that "it would be highly anomalous in a case in which the underlying claim is one of self-determination for the Court to vindicate that right by simply mandating the creation of some particular sort of institution of government." *Harjo,* 420 F.Supp. at 1144. Further, if the legitimate tribal institutions are no longer functioning or are no longer able to fulfill their duties, the power to make such important determinations for the tribe in question lies with the people of the tribe—not with the federal government. *See id.* at 1146. In *Harjo,* for instance, this Court indicated that "consent for fundamental political decisions may only be obtained from the ultimate source of legislative authority, the people themselves. . . . [A] feasible and appropriate approach would be to consult the members of the tribe directly, by means of a referendum." *Id.* at 1146.

■ As a general matter, the IBIA's administrative law decisions comport with the principle of respecting tribal self-government. It is IBIA policy that "under the doctrines of tribal sovereignty and self-determination, a tribe has the right initially to interpret its own governing documents in resolving internal disputes, and the Department must give deference to a tribe's reasonable interpretation of its own laws." *United Keetoowah Band of Cherokee Indians in Oklahoma v. Muskogee Area Director,* 22 IBIA 75, 80 (June 4, 1992). The IBIA further asserted that "the Department has both the authority and *responsibility* to interpret tribal law when necessary to carry out the government-to-government relationship with the tribe." *Id.* (emphasis added). While respecting tribal sovereignty, the BIA must

---

9. Respect for tribal self-government is also reflected in executive orders and various acts of Congress. *See e.g.,* Executive Order No. 13,084, 63 Fed.Reg. 27,655 (May 14, 1998) ("Since the formation of the Union, the United States has recognized Indian tribes as domestic dependent nations under its protec-

tion. In treaties, our Nation has guaranteed the right of Indian tribes to self-government."); 25 U.S.C. § 450 *et seq.* (containing Congressional findings regarding "the obligation of the United States to respond to the strong expression of the Indian people for self-determination.")

sometimes interpret tribal law if doing so will affect federal-tribal relations. *See e.g., Estate of Mary Dodge Peshlakai v. Navajo Area Director,* 15 IBIA 24, 36 (Oct. 28, 1986) (stating that "[t]his policy extends to giving deference to the tribe's reasonable interpretation of its own laws when the BIA must interpret tribal laws to ensure that tribal action in which the Department has an interest is consistent with that law.")

All such interpretive efforts must effect as little disruption as possible of tribal sovereignty and self-determination. Moreover, the federal government is obliged to adhere to the clear meaning of statutory language if such language is plainly stated. *See, e.g., Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) (citing *Burns v. Alcala,* 420 U.S. 575, 580–81, 95 S.Ct. 1180, 43 L.Ed.2d 469 (1975)) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.") This principle extends to statutory construction as it relates to federal-tribal relations. *See Utah v. Babbitt,* 830 F.Supp. 586, 596 (D.Utah 1993), *aff'd* 53 F.3d 1145 (10th Cir.1995) (citing *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978)) ("A well established principle of Indian law is that statutory words should not be expanded beyond their clear meaning where to do so would result in an intrusion upon tribal sovereignty.")

### 1. *Circumstances surrounding the Constitution's adoption*

Based upon the simple application of mathematics, it seems readily apparent that the Tribe never ratified the Constitution that lies at the heart of this dispute. Article XIX of the proposed Constitution describes the means by which the Saint Regis Mohawk people may decide to adopt it or not to adopt it. *See* A.R. at vol. I, tab 3. Neither party suggests that 51% of those voting on the Constitutional referendum approved the ratification of the document, nor do they suggest that any tribal

authority certified that 51% of the voters did so. Indeed, the administrative record documents the Tribal Clerk's certification that 50.935093%—not 51% of those present and voting—supported the adoption of the Constitution. *See* A.R. at vol. I, tab 5.

When the Tribal Clerk declared that "the proposed tribal constitution is adopted by a majority of the Mohawk people," A.R. at vol. I, tab 5, she conflated the 51% requirement, an unmet threshold, with a majority. Previous drafts of the Constitution provide what in essence is a legislative history of the document suggesting that the premise under which 51% meant 50% plus one is inaccurate. Article XVIII of an early draft of the Constitution (Public Draft # 5A, revised 12/3/93), a document provided to the Court by Plaintiffs' counsel, states that "[t]his constitution, when adopted by a majority vote of the qualified voters of the Saint Regis Mohawk Tribe in which at least thirty percent (30%) of those entitled to vote, have been certified as having voted, shall become effective." *See* Pls.' Mem. Supp. Mot. Summ. J., Ex. 25. Whether through the appointed drafting committee or through its existing government, the Tribe consciously *abandoned* this "majority" threshold and in its place made 51% the mark by which it would measure constitutional ratification.

In deciding the Tribal disputes that came to their attention, the BIA and the IBIA had the authority to review Tribal procedures to ensure that the Tribal Court rulings on which they relied were reasonable. In *United Keetoowah Band of Cherokee Indians,* the IBIA made clear not only its authority, but also its "responsibility to interpret tribal law when necessary to carry out the government-to-government relationship with the tribe." *See* 22 IBIA at 80. The IBIA also retains the ability to review tribal political procedures when it is forced to recognize a person or an entity as a tribe's legitimate representative in relations with the United States. *See Pueblo of Zuni Concerned Community*

*Citizens Comm.*, 14 IBIA at 41–42. Although case law limits the extent to which the IBIA may decide internal tribal issues, it is clear that it must, at a minimum, determine whether or not tribal interpretations of their own laws are reasonable.

■ Both the record before the IBIA and its legal obligation to respect tribal sovereignty and self-determination should have led it to reject the BIA's determination that the Tribe's Constitution was valid. Aside from the simple fact that 51% of the voters in the Tribal referendum did not choose to adopt the Constitution, the very language of the Tribal Court decisions should have given Defendants pause before they adopted that Court's findings as federal policy. Judge Deom wrote that "[r]epeals in whole or in part of a Constitution must be clear and unmistakable and can never be implied or inferred.... It always must be clear and specific and narrowly interpreted. As fundamental law, Constitutions are never amended or repealed by implication of any kind." *Lazore I*; A.R. at vol. I, tab 12. Perhaps most damningly of all, she pronounced that "[c]ertification of the adoption of a tribal constitution is a special confirming act of the will of the people." *Lazore II*; R. at vol. I, tab 29.

Judge Deom's logic here is faulty to the extent that certification of the adoption of the Constitution, an act of the people to discontinue a governmental system that had existed for almost two hundred years and to implement in its place an entirely new and different paradigm of Tribal government, warrants the same degree of scrutiny as the does amendment of such a document. Defendants cannot deem to be reasonable the Tribal Court's determination that the tribe unequivocally adopted the Constitution. While the Tribal Court spoke eloquently of the need to adhere to the strict language of the document when amending or appealing it, it utterly disregarded the ambiguities surrounding the Constitution's adoption mechanisms. The plain language of the Constitution indicates that 51% of the voters had to approve it. Unlike the word "majority," a term explicitly replaced by the Tribe, "51%" is as clear and plain an electoral benchmark as the Tribe could create.[10] Although the Constitution in question is not a federal statute, the Court notes that federal courts have limited the construction of words to their clear meaning when to do otherwise would intrude upon tribal sovereignty. *See Utah v. Babbitt*, 830 F.Supp. at 596.

Moreover, an incongruity exists when a court rules on the validity of a document by which it itself was created. In a similar, though not identical situation to the one in this case, the Supreme Court addressed the question of whether a purported state constitution in Rhode Island was validly adopted during a period of great political tumult in that state. *See Luther v. Borden*, 48 U.S. (7 How.) 1, 37–39, 12 L.Ed. 581 (1849). In discussing the ability of a state court to rule on the validity of the constitution from which it derives its authority, Chief Justice Taney wrote:

> Indeed, we do not see how the question could be tried and judicially decided in a State court. Judicial power presupposes an established government.... The acceptance of the judicial office is a recognition of the authority of the government from which it is derived. And if the authority of that government is annulled and overthrown, the power of its courts and other officers is annulled with it. And if a State court should enter upon the inquiry proposed in this case, and should come to the conclusion that the government under which it acted had been put aside and displaced by an opposing government, it would cease to

**10.** Arguments that the Tribe validly adopted the Constitution seem to be based on how close the vote actually was, and how near to 50% the benchmark was. Yet the argument that 51% equals 50% plus one simply does not work unless exactly 100 votes were cast. If there were 200 voters, 51% would equal not 101, but 102 votes. When, as here, 909 votes were cast, 50% amounted to 454.5 votes, whereas 51% required 464 votes.

be a court, and be incapable of pronouncing a judicial decision upon the question it undertook to try. If it decides at all as a court, it necessarily affirms the existence and authority of the government under which it is exercising judicial power.

*Id.* at 42–43, 7 How. 1. Defendants failed to fulfill their responsibility to interpret tribal laws and procedures in a reasonable manner in order to carry out their duty to recognize a tribal government. *See United Keetoowah Band of Cherokee Indians,* 22 IBIA at 80; *Pueblo of Zuni Concerned Community Citizens Comm.,* 14 IBIA at 41–42.

2. *The question of an appropriate tribal forum*

When, in *Smoke I,* the IBIA ruled that "[a]ll the contentions made by appellants [that the tribal courts are invalid] are contentions which should be presented to a tribal forum," 30 IBIA at 33, it failed to reckon adequately with the difficulties such a process entailed. The IBIA elaborated that "[i]t is for a tribal forum, not BIA or this Board, to decide whether the tribal judge acted under valid tribal authority." *Id.* at 34. Not only were Tribal Court mechanisms disputed and, ultimately, non-functional, but when the Tribe sought to resolve these questions through referenda, the IBIA refused to accord recognition to these efforts toward resolution. The IBIA merely repeated the rhetoric of tribal exhaustion and federal non-interference with tribal affairs. By not determining for themselves whether or not the Constitution was valid, Defendants were derelict in their responsibility to ensure that the Tribe make its own determination about its government consistent with the will of the Tribe and the principles of tribal sovereignty. *See Harjo,* 420 F.Supp. at 1143.

In addition to deferring to the dubious Tribal Court's decisions, Defendants have ignored the will of the people of the Tribe throughout this lingering dispute. In this regard, Defendants' conduct directly violates the principles of tribal sovereignty that guide federal-Indian relations. *See id.* Throughout the period surrounding and following the original referendum election on the Tribal Constitution, increasingly forceful challenges to the Constitution's adoption as invalid have undermined its legitimacy. The transcript of the meeting at which the Tribal Council certified the adoption exemplifies the questionable nature of that certification. After lengthy discussions about how 51% of the voters did not ratify the constitution, the following exchange between Tribal leaders took place:

> Phil [Tarbell]—We don't want to do that again, I think we have too many important things on our table to let the 6/10ths of a percent stand between now and forever so I will certify it.
>
> Alma [Ransom]—John [Loran] said he would, Norman?
>
> Norman [Tarbell]—Well you have a majority there.
>
> P.J.—I think we just make a public statement that this is the decision based on these facts, theories and this is why it went this way so if it comes up in the future we'll put it Tribal Courts and if it ever comes up again the Tribal courts can dig it up and this is what was decided in June 5, 1995.
>
> Phil [Tarbell]—We can put it to rest and lets move on.

*Id.* This certification obviously transpired in circumstances of significant ambiguity, but Defendants chose to ignore the well-founded objections of those who insisted that the Three Chiefs System continued in force.

Defendants rely on the rulings of the purported Tribal Court to negate the expressions of the Saint Regis Mohawk people represented by the second referendum and the Legislative Council's subsequent recission of the Constitution and reversion to the Three Chiefs System. Moreover, following the "clean slate" referendum, the BIA relied upon Judge Deom's two *Lazore* decisions in refusing to recognize the gov-

ernment chosen by the Saint Regis Mo-
hawk People. *See* A.R. at vol. I, tab 34.

In *Smoke I,* Defendant IBIA plainly told
the Tribe that it was "for a tribal forum
...to decide whether [Judge Deom] acted
under valid tribal authority." *See* 30 IBIA
at 34. When the Tribe *informed the IBIA*
that the Tribal Court was not functioning,
the IBIA responded that either a "judicial
or nonjudicial" Tribal forum must judge
the Tribal Court's validity.[11] *See Smoke
II,* 30 IBIA at 91. Accordingly, the Tribe
put the question of the Tribal Court's va-
lidity to a referendum vote, whereby 394 of
the 411 members voting affirmed that the
Tribal Court was without authority. *See*
A.R. at vol. II. First, the BIA questioned
the validity of this referendum. *See* A.R.
at vol. I, tab 55. Once Tribal Clerk
Herne certified that the Tribe adhered to
all proper procedures in conducting the
referendum, the BIA simply ignored the
results, and reiterated its recognition of
the Tribal Constitution and of the Consti-
tutional Government. *See id.;* A.R. at vol.
I, tab 65. This Court has held that when
tribal governmental entities are "irremedi-
ably unavailable," a referendum is an ap-
propriate way for the Tribe to reach deci-
sions that have authority and legitimacy.
*See Harjo,* 420 F.Supp. at 1146. Defen-
dants should have acknowledged the re-
sults of that referendum. *See id.*

3. *Pressure on the Tribe to embrace a
constitutional system*

In a final affront to Tribal self-govern-
ment prior to this litigation, the IBIA dis-
missed the Three Chiefs Government's fi-
nal appeals as moot because the Three
Chiefs were elected to, and comprised, a
functioning majority of the Constitutional
Government offices. *See Smoke III,* 31
IBIA at 99. But the fact that Plaintiffs
took on that label does not signal an aban-
donment of their pleas for the vindication
of their right to self-determination. Be-
cause the BIA refused to acknowledge the

will of the Tribe, thus holding up critical
federal funds, the Three Chiefs maintained
a facade of operating under the Constitu-
tional Government. *See* Pls.' Status Rep.
at 3. In essence, Plaintiffs perceived a
fiscal coercion that belied the tribal sover-
eignty and self-determination which De-
fendants profess to respect.

Finally, the record suggests that the
BIA wanted the Tribe to embrace a consti-
tutional form of government. In a Novem-
ber 18, 1996 fax from the Bureau's New
York Field Officer, Dean White, to Defen-
dant Keel, White stated that "[w]e do have
a collateral interest [in this dispute] as the
Constitution and tribal court were devel-
oped under Bureau funding." A.R. at vol.
III. On March 28, 1997, the Bureau re-
sponded to an inquiry about the tribal
dispute from the Honorable John McHugh,
the United States Representative for the
congressional district in which the Saint
Regis Mohawk Tribe is located. *See* A.R.
at vol. I, tab 62. In its response, the
Bureau noted that "over the years we have
provided the St. Regis Mohawk Tribe with
grants, contracts, and other financial assis-
tance in order that the tribe might estab-
lish its own written governing documents
.... " *Id.*

In addition, the BIA took steps to frus-
trate the will of the Tribe and to support
the Constitutional regime. In his fax to
Defendant Keel, Dean White wrote of a
plan to appoint a Three Chiefs Govern-
ment member to fill a vacancy in the Con-
stitutional Government. *See* A.R. at vol.
III. Of the plan, White commented that
"the idea is to coopt the unrecognized
council, which seems to have popular sup-
port, with the recognized governmental fo-
rum." *Id.* While Dean White approved of
the plan, he noted that Phil Tarbell, a
proponent and key member of the Consti-
tutional Government "balked at the idea."
*See id.*

---

**11.** Defendants do not admit that the tribal
courts were non-functional at this point in the

dispute.

The IBIA instructed the Tribe to pursue the question of Judge Deom's authority and the validity of her rulings within the Tribal Court system, but the Tribe replied that the trial-level Court was non-functional.[12] *See, e.g., Smoke II,* 30 IBIA at 90. Following the IBIA's mandate that the Tribe decide these issues in a different tribal forum, the Tribe turned to the ultimate tribal forum—a referendum. *See id.* at 91; A.R. at vol. I, tab 43. When the referendum results made clear that the Tribal Court had no authority, the BIA and IBIA simply ignored the results. *See* A.R. at vol. I, tab 55. Defendants' rhetoric endorsing the principles of self government and tribal sovereignty ultimately rings hollow here. The essence of tribal self-determination is the Tribe's ability to choose for itself how its government will operate. For Defendants to refuse to acknowledge that choice because they disagree with it, or to actively seek to institute the form of government that they prefer, turns that notion on its head. Defendants' repeated refusal to recognize the Tribe's earnest efforts to undo its contentious certification of the Constitution, couched in the language of respect for tribal sovereignty, is disingenuous at best. Upon review, Defendants' actions reveal themselves to be arbitrary, capricious, and contrary to law. For this reason, Plaintiffs are entitled to summary judgment. *See* 5 U.S.C. § 706(2)(A).

## III. CONCLUSION

Both because their request was untimely and because the Constitutional Government is neither a necessary nor an indispensable party, Defendants' Motion to Amend their Answer is denied. Finally, the Court finds that Defendants' actions were arbitrary, capricious and contrary to law, and therefore the Court grants Plaintiffs' Motion for Summary Judgment and denies Defendants' Motion for Summary Judgment.

12. Neither party appears to suggest that any tribal appellate system was in place to which

An ORDER accompanies this Memorandum Opinion.

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is, this 29 day of September, 1999, hereby

**ORDERED** that Plaintiffs' Motion for Summary Judgment [# 26] is GRANTED; and it is further

**ORDERED** that Defendants' Motion for Summary Judgment [# 34] and Motion for Leave to File an Amended Answer [# 43] are both DENIED.

**SO ORDERED.**

plaintiffs might have turned.