Sandra THOMAS, Tina Thomas, Robert E. Sander, and Estate of Michael Nalewaja, by his Personal Representative, Beverly Nalewaja, Plaintiffs,

v.

UNITED STATES; U.S. Department of Interior, Bureau of Indian Affairs; Gale A. Norton, Secretary of the Interior, in her official capacity; and M. Sharon Blackwell, Deputy Commissioner of the Bureau of Indian Affairs, in her official capacity, Defendants.

No. 96–C–828–C.

United States District Court,
W.D. Wisconsin.

April 25, 2001.

Tracey Schwalbe, Duxstad, Vale, Bestful & Gartzke, New Glarus, WI, for Beverly Nalewaja, Michael Nalewaja, Robert E. Sander, Sandra Thomas, Tina Thomas.

Richard D. Humphrey, Assist. U.S. Atty., Madison, WI, for Bruce Babbitt, Sharon Blackwell, Eddie F. Brown, Bureau of Indian Affairs, Ada E. Deer, Kevin Gover, David J. Matheson, Gale A. Norton, U.S. Dept. of Interior, U.S.

Michael C. Hager, Larry Leventhal & Associates, Minneapolis, MN, for Eugene Begay, Donald E. Carley, Constance Corbine, Margaret Diamond, Gaiashkibos, Michael Isham, Jr., Alfred Trepania, Tribal Governing Bd. of LCO.

Larry B. Leventhal, Larry Leventhal & Assoc., Minneapolis, MN, for Lac Courte Oreilles Band of Lake.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for declaratory, injunctive and monetary relief that is before the court on remand from the Court of Appeals for the Seventh Circuit. Pursuant to 25 U.S.C. § 476(d)(2), plaintiffs are asking the court to declare approval of certain amendments to the Constitution of the Lac Courte Oreilles Band of Lake

Superior Chippewa Indians voted upon by the tribal membership in the Secretarial election sponsored by the United States Secretary of the Interior on February 1, 1992. In their original complaint, plaintiffs alleged four causes of action: 1) for declaratory and injunctive relief pursuant to 25 U.S.C. § 476(d)(2), requiring that the government defendants declare the 1992 amendments valid and enforceable; 2) for declaratory and injunctive relief pursuant to 5 U.S.C. § 706 for the Secretary's alleged arbitrary and capricious action; 3) for compensatory damages from former Assistant Secretary of the Interior for Indian Affairs Eddie Brown and former Deputy Commissioner of the Bureau of Indian Affairs David Matheson in their individual capacities for alleged violations of plaintiffs' constitutional rights; and 4) for compensatory damages for the government's alleged breach of its trust responsibility to the tribe.

In an order entered on October 14, 1997, I dismissed plaintiffs' third cause of action on the ground that the court lacked personal jurisdiction over former defendants Brown and Matheson in their individual capacities; plaintiffs did not appeal this decision. In the same order, I held that the tribal governing board was a necessary party to the litigation because the proposed amendments dealt with matters of fundamental importance to the tribe; the governing board might refuse again to enforce the amendments even if the Secretary approved the election results as a consequence of this suit; and the Bureau of Indian Affairs might be exposed to additional litigation over the same election if it approved the election results and the governing board sued for a reversal of the decision. In an order entered on March 27, 1998, I dismissed the entire case because I believed that the tribal governing board was an indispensable party to the litigation; it refused to join the suit voluntarily; and it could not be joined against its will because it was immune from suit. On appeal, this decision was reversed and the case was remanded. *See Thomas v. United States*, 189 F.3d 662 (7th Cir.1999). Proceedings in this court were stayed pending disposition of plaintiffs' request for a writ of certiorari from the United States Supreme Court, which was denied in October 2000. *See Tribal Governing Board of Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Thomas*, 531 U.S. 811, 121 S.Ct. 33, 148 L.Ed.2d 13 (2000). In an order entered January 8, 2001, I denied the motion to intervene filed by the tribal governing board of the Lac Courte Oreilles Band of Lake Superior Chippewa Indians and individual board members Gaiashkibos, Michael Isham, Jr., Donald E. Carley, Alfred Trepania, Margaret Diamond, Constance Corbine and Eugene Begay, individually and in their official capacities, concluding that the motion was untimely and that granting it would cause prejudice to plaintiffs as well as delay in the eventual resolution of the case. In that order, I allowed the proposed intervenors to submit briefs as amicus curiae in this case.

Presently before the court are the parties' renewed cross motions for summary judgment. Defendants have filed a motion to supplement their summary judgment materials; plaintiffs have filed supplemental materials as well. Both sides' supplemental submissions will be considered in deciding their cross motions for summary judgment. Plaintiffs' motion for summary judgment will be granted as to their claims that defendants violated the Indian Reorganization Act and Administrative Procedure Act by revoking prior approval of the amendments to LCO's tribal constitution beyond the 45 day limit provided by statute for review and by setting forth the requirement that the appropriate class of

voters in Secretarial elections is the class that had voted to adopt LCO's tribal constitution in 1966. Defendants' motion for summary judgment will be granted as to plaintiffs' claim that the United States violated a trust responsibility for which it is liable for monetary damages.

The following undisputed facts are taken from the Joint Proposed Stipulated Facts and each side's proposed additional facts.

## UNDISPUTED FACTS

### A. *The Parties*

Plaintiff Sandra Thomas is an LCO member who lives within the LCO reservation. Thomas has 5/16 LCO blood. Plaintiff Tina Thomas is the daughter of plaintiff Sandra Thomas and Jerry Thomas (a non-Indian). She lives within the reservation and is listed on the ancillary roll; she has 5/32 LCO blood. Plaintiff Robert E. Sander is an LCO member and has less than ½ degree LCO blood; he lives outside the reservation. Michael Nalewaja, who is deceased, was an LCO member with ¼ LCO blood and lived outside the reservation. His estate is being represented in this case by his personal representative, Beverly Nalewaja. All plaintiffs reside in the Western District of Wisconsin.

Defendant Bureau of Indian Affairs is an executive agency of the United States Department of Interior and has authority to oversee relations between the United States and the various Indian tribes. Defendant Gale Norton is Secretary of the Department of the Interior; she is named in her official capacity. Defendant M. Sharon Blackwell is the Deputy Commissioner of the Bureau of Indian Affairs; she is named in her official capacity.

### B. *The Tribe's Organization and Membership*

In 1966, the Lac Courte Oreilles Band of Lake Superior Chippewa Indians adopted the LCO Constitution under the Indian Reorganization Act. Several amendments have been made to the tribal constitution since its adoption, but as of 1992 it provided that LCO membership would consist of the following classes of individuals: (1) all persons of LCO blood who were listed on the tribe's 1940 census roll or were eligible to be included on that roll; (2) any lineal descendent of an LCO member who was born prior to 1966; and (3) persons who were born between November 2, 1966 and April 7, 1969 and had at least ⅛ LCO blood and persons who were born after April 7, 1969 who had at least ¼ LCO blood (and applied for membership under the tribal ordinance). As of February 1992, the LCO tribe had 4,378 members, of whom 3,659 were eligible to vote; 1,127 individuals were listed on the tribe's ancillary roll, which is a list of the children of LCO members who do not meet membership requirements.

Article IX of the LCO Constitution provides that

> This Constitution and Bylaws may be amended by a majority vote of the qualified voters of the Band voting at an election called for that purpose by the Secretary of the Interior, provided at least 30 percent of those entitled to vote shall vote in such election. No amendment shall become effective until approved by the Secretary of the Interior.

> It shall be the duty of the Secretary of the Interior to call an election on any proposed amendment upon request by majority vote of the Lac Courte Oreilles Governing Board or upon petition of at least 75 qualified voters of the Band.

The LCO Constitution defines "qualified voter" as "members of the Band eighteen (18) years of age or over."

## C. *The Proposed Amendments*

In the late 1980s, some LCO members began to consider amending the tribal constitution to change the structure of tribal government and the standards for tribal membership. As vice-chairperson of the LCO Tribal Governing Board and then as chairperson of the Constitutional Revisions Committee, plaintiff Sandra Thomas held meetings of the tribal membership from 1988 to 1991 to discuss amending the constitution. The committee obtained the signatures of hundreds of tribal members on petitions for five proposed amendments. After two years of meetings, on September 17, 1991, plaintiff Sandra Thomas filed four of these petitions for amendments with the Bureau of Indian Affairs for approval; she served as the spokesperson for the petitions. These petitions were submitted by petition of qualified voters, not through the tribal governing board.

In a letter dated September 20, 1991, the Bureau of Indian Affairs Great Lakes Agency Superintendent wrote to Sandra Thomas acknowledging receipt of the petitions. No challenges were made to any of the signatures on the petitions within the 15 days they were available for examination by authorized voters of the tribe.

The Twin Cities Field Solicitor for the Department of the Interior held that two of the four petitions had signatures dating back to 1989 and were stale. The Minneapolis Area Director of the Bureau of Indian Affairs determined that these two petitions had not been submitted in a timely manner. On November 5, 1991, the area director authorized the superintendent to conduct a Secretarial election on the two remaining petitions. The area director stated that the proposed amendments would not become effective until he had approved them. Proposed amendment A eliminated the blood quantum requirement for tribal membership and enabled any descendant of an LCO member to gain membership. Proposed amendment B extended the term-length of LCO governing board members to four years.

## D. *The Election*

The superintendent obtained the names of the individuals who would serve on the election board and set the election for February 1, 1992. Prior to that date, the Bureau of Indian Affairs sent out registration packets to the 3,659 voting-eligible LCO members, advising them of the election and informing them about the need to register, which 1,130 LCO members did. After the registered voter list was posted on January 8, 1992, no objections were made to any persons on the list.

In a letter dated January 31, 1992, tribal governing board chairman Gaiashkibos raised concerns to the Great Lakes Agency office of the Bureau of Indian Affairs regarding the registration procedures and the allowance of absentee voting. Gaiashkibos indicated that he had received complaints that tribal members would be denied their right to vote in the Secretarial election; that the LCO Constitution was being abridged by allowing absentee balloting; and that "the tribal members rights must be upheld and the right to vote must not be abridged."

The Bureau of Indian Affairs sponsored the Secretarial election on the two proposals to amend the LCO Constitution on February 1, 1992. The election results were as follows. Of the total 1,130 registrants, 650 cast votes (474 of which were by absentee ballot). Plaintiffs Sandra Thomas and Robert Sander voted in person at the tribal office in the 1992 election. Amendment A passed by a vote of 542 to 105 and amendment B passed by a vote of 373 to 274. On February 2, 1992, the election results were posted.

### E.  *The Post–Election Proceedings*

On February 3, 1992, Gaiashkibos wrote to the local Bureau of Indian Affairs office because he was concerned that a provision of the tribal constitutional had not been met; he was concerned that the amendments had not been approved by at least 30% of the eligible voters.  In a letter dated February 5, 1992, the Acting Superintendent of the Bureau of Indian Affairs Great Lakes Agency office sent Gaiashkibos an opinion letter from Field Solicitor Patricia Wilfahrt in which Wilfahrt said that Gaiashkibos's concerns were answered by looking at the LCO Constitution and bylaws and 25 C.F.R. Part 81.

In a letter dated February 5, 1992, LCO member Odric Baker challenged the Secretarial election, arguing that (1) the Bureau of Indian Affairs had not followed the limits on absentee voting set forth in the tribal constitution; (2) some tribal members were concerned that they had not been notified about the election; (3) some tribal members had not registered because they did not believe they had to register again, but thought they could register on election day; (4) 30% of eligible voters had not voted as required by the tribal constitution.  (Baker did not register to vote in the 1992 Secretarial election.)  On February 10, 1992, the Acting Superintendent forwarded Odric Baker's letter to the Area Director, noting that "The Lac Courte Oreilles Secretarial election was conducted on February 1, 1992 pursuant to all applicable rules and regulations.  Subject amendments to the Constitution previously forwarded to the Area Office are recommended for approval."  On February 10, 1992, Acting Area Director Michael Fairbanks gave official approval to the amendments.  There was no disapproval of the amendments within 45 days of the election.

The language of Amendment A as approved was Amendment XXIII to Article II Membership (Section 2):

The Governing Board shall enact the ordinance subject to the approval of the Secretary of the Interior stating the criteria for future membership and adoption for the new members.  Such ordinance shall include the provision that to be eligible for membership persons must possess Lac Courte Oreilles Indian Blood and must be a lineal descendant of an enrolled member.  Any amendments to the ordinance shall require approval of the Secretary of Interior.

The language of Amendment B as approved by Amendment XXIV to Article IV—Elections (Section 4):

In 1992, three (3) Board members shall be elected to serve a one-time three year term.  Beginning in 1992, four (4) Board members shall be elected to serve a four (4) year term.  Thereafter, all Board members shall serve four (4) year terms.  Consequently, beginning in 1992, elections shall be held every two (2) years (or every odd-numbered year).

In a letter dated February 13, 1992, the local office sent written notice of the approved amendments to Gaiashkibos and plaintiff Sandra Thomas, as spokesperson for the petitions.  In a letter dated February 24, 1992, Area Director for the Minneapolis Area Office of the Bureau of Indian Affairs Earl Barlow responded to challenges raised by Odric Baker, stating "[b]ased on the fact the Secretarial Election to amend the Constitution and Bylaws of the Lac Courte Oreilles Band was conducted in accordance with the applicable regulations set forth in 25 C.F.R. 81, I am upholding the election and affirming the decision of approval."  Barlow responded to each of Baker's concerns: (1) the election was governed by the federal regulations regarding absentee ballots, not the

tribal constitutional provisions, because it was a federally sponsored Secretarial election; (2) the voter list was taken directly from the tribe's enrollment list and individuals should have notified the tribe of a change of address; (3) it is unclear why potential voters were confused about registration procedures because the instructions on the notice of election stated that members had to register by completing the voter registration form and submitting it to the election board by January 7, 1992, in order to be eligible to vote in the Secretarial election; and (4) eligible voters were not entitled to vote until they had registered; the constitution requires that 30% of those who registered and were entitled to vote must have voted in the election.

In a letter to Gaiashkibos dated March 2, 1992, the Acting Superintendent sent copies of the responses to Gaiashkibos's and Baker's challenges and the approved amendments and wrote, "Based on the fact that the Secretarial Election to amend the Constitution and Bylaws of the Lac Courte Oreilles Band was conducted in accordance with the applicable regulations set forth in 25 C.F.R., Part 81, the Area Director upholds the election and affirms the decision of approval." Plaintiff Sandra Thomas was sent a copy of this letter.

In a letter dated April 16, 1992, Gaiashkibos indicated his dissatisfaction with the Field Solicitor's opinion. In a letter to former Assistant Secretary of the Interior for Indian Affairs Eddie Brown dated April 24, 1992, Gaiashkibos asked the Bureau of Indian Affairs to recall the Secretarial election because (1) the tribal membership had not been informed adequately of the issues so only 12% of the total eligible voters living on the reservation had voted in the election; (2) the Bureau of Indian Affairs election packets had not been sent to certain tribal members because the Bureau of Indian Affairs used

the wrong zip code; and (3) the LCO Constitution did not allow for absentee balloting.

On April 18, 1992, the tribal governing board passed a resolution to "not recognize" the two new amendments.

In a letter to Eddie Brown dated April 23, 1992, plaintiff Sandra Thomas sought assistance under the Bureau of Indian Affairs' trust responsibility to insure compliance with the approved amendments. In a letter to Brown dated April 24, 1992, plaintiff Sandra Thomas objected to the merits of the issues raised by Gaiashkibos and pointed out that deadlines for filing objections to the election had passed. On May 5, 1992, Gaiashkibos sent a petition by the "People of Lac Courte Oreilles demanding that the Lac Courte Oreilles Tribal Governing Board not recognize the Secretarial election."

In an internal memo dated June 1, 1992, the Bureau of Indian Affairs Great Lakes Agency Director forwarded Gaiashkibos's complaints to Washington, stating that "It is the position of this office that this is not a valid issue because the timeframe for contesting the results in 25 C.F.R. Part 81, is very specific, at best the issue is moot." The June 1 memo attached a chronological narrative of the election and stated, "The only item in the conduct of this election which could be subject to criticism is the error involving the wrong zip code on return envelopes. . . . However, the action taken by the Agency Tribal Operations Officer, Area Tribal Operations Officer, and the Secretarial Election Board adequately rectified the situation."

In June 1992, Gene Begay, as a special adviser to Gaiashkibos, met with Bureau of Indian Affairs officials in Washington. On June 30, 1992, Brown sent correspondence to Gaiashkibos and councilmember Ray Wolf, acknowledging receipt of the April letters from Gaiashkibos and Sandra

Thomas and other councilmembers. On August 27, 1992, Begay wrote Director of Tribal Services Ronald Eden that he had met with Eden, Pat Simmons and Mr. Delaware on June 3, 1992, and had discussed "the problem at Lac Courte Oreilles concerning lineal descendancy."

On October 7, 1992, then Deputy Commissioner of the Bureau of Indian Affairs David Matheson sent Gaiashkibos a formal reply to his April 24 letter. Matheson signed the letter as "Acting Assistant Secretary for the Department of Interior." Matheson informed Gaiashkibos that the amendments were effective from the date of adoption and approval and that the governing board had no authority to declare the results of a Secretarial election void. Matheson indicated also that he had looked beyond the issues Gaiashkibos had raised and had determined that irregularities had occurred in the election. Matheson revoked the previous approval of the amendments, explaining that elections on amendments to tribal constitutions had to be conducted in the same manner as the election on the original constitution had been conducted, which meant that the voters had to be of the same class. Although Matheson could not find a voter list from 1966, he found an election notice that stated the following persons were eligible to vote at the September 3, 1966 Secretarial election: (1) persons whose names were on the 1940 census roll and living on the reservation; (2) descendants of the above who were at least 21 years old and living on the reservation; and (3) persons who do not live on the reservation if they are at least ½ degree Indian blood and their names appeared on the 1940 census roll. Nonresidents could vote by absentee ballot and residents could vote on the reservation. Matheson revoked the prior approval of the amendments because his preliminary analysis indicated that only 75 of the 474 tribal members who had submitted absentee ballots had ½ degree LCO blood. Although Matheson revoked approval of the 1992 results, he explained that the Bureau of Indian Affairs was compelled to hold an election on the two proposed amendments and said that he would direct the local Bureau of Indian Affairs office to make such arrangements. Matheson stated that the only LCO members permitted to vote in future elections would be those adult members who lived within the reservation and non-residents who had at least ½ LCO blood. Matheson did not make a finding that the amendments themselves violated the law but he expressed the following concerns about the amendments.

We share your concern about eliminating the blood quantum in favor of mere descendancy.... There is a substantial temptation for some tribes to increase the number of persons it considers members by lowering blood quantum or membership standards without regard to the extent to which the persons have actually maintained meaningful, bilateral relations with the tribe. Under Federal programs, the amount of money available to the tribe may be tied directly to the service population. Thus, increasing the tribal membership increases the dollars available to the tribal leasers to manage without diluting any of the tribe's assets. The danger of this process is that it weakens the bonds of tribal membership. Without meaningful interaction between the tribe and its members, the very logic and foundation of tribal jurisdiction and sovereignty are undermined. With the ever increasing attacks in these areas coupled with limits on Federal dollars available to Indian tribes, Indian tribes would do well to heed the danger and avoid it entirely by adopting realistic membership. If there ceases to exist a demonstrable bilateral, political relationship between a tribe and

its members, the courts or Congress may well decide that a tribe has so diluted the relationship between a tribal government and its members that it has "self-determined" its sovereignty away.

In a letter to Matheson dated October 20, 1992, Gene Begay wrote that he concurred "with [Matheson's] analysis of the problems of descendancy membership in Tribes" and that he would remind Gaiashkibos to follow up on the matter of the new Secretarial election. In a letter dated November 5, 1992, the Area Director informed Gaiashkibos that the "petitioners' request for a Secretarial Election was valid, and despite the Acting Assistant Secretary's revocation of the amendments on October 7, 1992, a new election will have to be held on the same amendments when so directed."

On November 7, 1992, plaintiff Sandra Thomas wrote to Brown, appealing Matheson's decision. The Bureau of Indian Affairs received this letter on November 13, 1992, but it lost the letter and has taken no further action on Matheson's decision.

In a letter dated April 18, 1995, the Superintendent informed Gaiashkibos that (1) "Upon receipt of the two petitions, it was the duty of the Secretary to call and conduct that election"; (2) the Assistant Secretary had advised that the Minneapolis Area Director would be directed to call and conduct a new election; and (3) he was in the process of contacting the Assistant Secretary through the Minneapolis Area Director, regarding this pending action.

In a letter dated April 27, 1995, Gaiashkibos objected to the calling of a new Secretarial election. On May 1, 1995, the Superintendent responded to Gaiashkibos, referring to the language of Matheson's decision that the new election must be called. In an internal memo dated May 16, 1995, the Superintendent requested the Assistant Secretary, through the Area Director, to conduct the new Secretarial election. The Superintendent noted that he had conducted a further review of the petitioners and had determined that at least 75 of the petitioners fell within the eligible class of voters set forth by the Matheson decision. The Acting Area Director sent the Agency Superintendent's memo to Washington and asked the Chief of the Division of Tribal Government Services to expedite a response to the agency's inquiry. In a letter to Gene Begay dated June 27, 1995, Denise Homer, Minneapolis Area Director, declined Begay's invitation to meet with the LCO Constitutional Revisions Committee to discuss Secretarial elections, stating "It is important to sustain a relationship with the Agency because the Agency has a direct administrative and trust relationship with the Lac Courte Oreilles Band."

In July 1995, Gene Begay met with Assistant Solicitor Scott Keep to determine whether the tribe could pass a resolution setting up an election on different proposed amendments before the Secretary held a re-election on the 1992 proposed amendments. On July 24, 1995, Begay faxed Keep a draft tribal resolution captioned "Dismissal Secretarial Election Held February 1, 1992." Keep faxed a response to Begay with handwritten notes, "Gene—Call me if you cannot read my hand-written suggested changes." The handwritten suggested changes included renumbering the paragraphs and adding language that "a new election was not authorized" and "Whereas the TGB has only recently learned that the BIA intended to call a new election on the old February 1, 1992, proposals...." On July 28, 1995, the tribal governing board adopted resolution No. 95–58, declaring that a new election was not authorized and asking the

Bureau of Indian Affairs not to hold another Secretarial election.

In May 1996, Vice Chairperson of the Tribal Governing Board Margaret Diamond wrote to the Superintendent of the Great Lakes Agency to request review of Matheson's decision because several tribal members were concerned that off-reservation members with less than ½ degree LCO blood would not be allowed to vote in a second Secretarial election. Diamond's letter was sent to the Minneapolis Area Director by the Agency Superintendent by memo dated May 24, 1996. In the memo, the superintendent noted that "on May 16, 1995, we sent a memorandum to the Assistant Secretary–Indian Affairs, through your office, requesting a determination on the above referenced 1992 Secretarial Election.... To date, we have not received a response to this request." The Acting Director submitted these requests to the Office of Tribal Services by memo dated July 1, 1996. The Bureau of Indian Affairs has not held a replacement Secretarial election on the amendments.

The three members of the tribal governing board who were present at the meeting supported a motion on May 19, 1997, "to support the Plaintiffs in the lawsuit" but not "to join the lawsuit at this time." On July 1, 1997, Gaiashkibos and Eugene Begay became members of the tribal governing board. They replaced Ray Wolf and Art Tainter. Tribal board members continue to be elected to two-year terms.

### F. Referendum

In a letter dated March 2, 2000, LCO Tribal Governing Board Chairman Gaiashkibos wrote to LCO tribal members, informing them of a tribal referendum to be held on April 29, 2000, and enclosing a sample referendum ballot. On April 29, 2000, the tribal governing board sponsored a non-binding tribal referendum. Of the 575 valid ballots cast, 299 tribal members, or 52%, favored lineal descendancy over any specific blood quantum requirement for membership in the LCO Band.

### G. Plaintiffs' Damages

Plaintiffs Sandra Thomas and Sander are affected by the Bureau of Indian Affairs's decision because they must reside on the reservation to vote in future constitutional elections because they have less than ½ degree LCO blood. Plaintiff Tina Thomas is affected by the decision because she cannot obtain full LCO membership, as she would have been able to under the 1992 tribal membership amendment.

## OPINION

### A. Background

"The roots of the concept of tribal sovereignty and self-determination reach back" to Article 1, Section 8, Clause 3 of the Constitution, which grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several states, and with the Indian Tribes." *Ransom v. Babbitt*, 69 F.Supp.2d 141, 149 (D.D.C.1999). The Supreme Court has recognized the right to self-government as a fundamental aspect of tribal existence. *See White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142–45, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980); *see also* Executive Order No. 13,084, 63 Fed.Reg. 27,-655 (May 14, 1998) ("Since the formation of the Union, the United States has recognized Indian tribes as domestic dependent nations under its protection. In treaties, our Nation has guaranteed the right of Indian tribes to self-government.... The United States continues to work with Indian tribes on a government-to-government basis to address issues concerning Indian tribal self-government, trust resources, and Indian tribal treaty and other rights."). In 1934, Congress passed the

Indian Reorganization Act, also known as the Wheeler Howard Act, in order to "establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically." *Morton v. Mancari,* 417 U.S. 535, 542, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974).

### 1. *Indian Reorganization Act*

■ The Indian Reorganization Act, 25 U.S.C. § 461–479, and the accompanying regulations, 25 C.F.R. § 81.1–81.24, set forth the procedures that an Indian tribe must follow to amend its constitution. "Secretarial elections ... are federal-not tribal-elections." *Thomas,* 189 F.3d at 667. The tribe must ask the Secretary of the Interior to call and conduct an election. *See* 25 U.S.C. § 476(c)(1). At least twenty days before the election, an election board that consists of one Bureau of Indian Affairs officer and two members of the tribal government, *see* 25 C.F.R. § 81.8(a), is required to post a list of registered voters. *See* 25 C.F.R. § 81.12. The election board must resolve any challenges to the voter list at least ten days before the election. *See* 25 C.F.R. § 81.13.

■ Once the Secretary receives a qualifying request to hold an election to ratify proposed amendments, the Secretary must call and hold an election within 90 days. *See* 25 U.S.C. § 476(c)(1)(B). The election results are not binding until the Secretary approves them, and any qualified voter may contest the results to the Secretary within three days following the posting of the results of an election by filing "the grounds for the challenge, *together with substantiating evidence.*" 25 C.F.R. § 81.22 (Emphasis in original). The regulation does not enumerate permissible grounds for challenges. The Secretary may order a new election or a recount if he or she decides that the objections are

valid. *Id.* "The Secretary's powers to disapprove an election upon the filing of a proper challenge are very broad, and can include flaws in the make-up of the eligible electorate." *Thomas,* 189 F.3d at 667 (citing *Shakopee Mdewakanton Sioux (Dakota) Community v. Babbitt,* 107 F.3d 667 (8th Cir.1997)).

The Secretary has 45 days to resolve election contests, conduct an independent review and approve or disapprove the election. *See* 25 U.S.C. § 476(d)(1). The Secretary's authority to review amendments that have been ratified by a majority vote is limited to insuring that they comply with applicable federal law. *See* § 476(d)(1). If they do not, the Secretary may disapprove them within forty-five days of the election. *Id.* If the Secretary does not approve or disapprove the amendments within that time, the amendments are deemed to have been approved and become effective. *See* § 476(d)(2). The Indian Reorganization Act provides a private right of action to enforce the statutory scheme of the act in federal district court. *See* § 476(d)(2)("Actions to enforce the provisions of this section may be brought in the appropriate Federal district court.")

### 2. *Administrative Procedure Act*

■ The Administrative Procedure Act, 5 U.S.C. §§ 701–706, sets forth the standards for judicial review of an agency's decision. Section 706(2)(a) of Title 5 of the United States Code states, "The reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." An agency's legal determinations will be affirmed as long as they are not arbitrary or capricious and are in accordance with the law. *See Sierra Resources Inc. v. Herman,* 213 F.3d 989, 992 (7th Cir.2000). The arbitrary and capri-

cious standard is highly deferential: even if a reviewing court disagrees with an agency's action, the court must uphold the action if the agency considered all relevant factors and the court can discern a rational basis for the agency's choice. *See Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on other grounds in Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). The agency's decision is not arbitrary or capricious as long as " 'the agency's path may be reasonably discerned.' " *Mount Sinai Hospital Medical Center v. Shalala*, 196 F.3d 703, 708 (7th Cir.1999).

The Supreme Court has delineated a two-step approach to reviewing an agency's construction of a statute that it administers. First, the court must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear ... the court as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If the statute is silent or ambiguous with respect to the specific issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* (explaining "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer").

### B. *Time Frame Issue*

Plaintiffs contend that defendants exceeded their statutory authority under the Indian Reorganization Act, 25 U.S.C. § 476(d), and the Administrative Procedure Act, 5 U.S.C. § 706(2), when former Deputy Commissioner of the Bureau of Indian Affairs David Matheson revoked the approval of the constitutional amendments almost seven months beyond the deadlines set forth in 25 U.S.C. § 476(d). *See also* 25 C.F.R. § 81.22. Defendants contend that they were obligated to revoke approval of the amendments upon the discovery that there had been a fundamental flaw in the election process because the class of LCO members who had voted in the 1992 Secretarial election was not the same class of voters who had been eligible to vote in the 1966 Secretarial election in which the LCO had adopted its constitution originally.

Before Congress amended the Indian Reorganization Act in 1988, the act did not provide for specific deadlines for Secretarial elections. The need for such deadlines became apparent following the decision in *Coyote Valley Band of Pomo Indians v. United States*, 639 F.Supp. 165 (E.D.Cal. 1986). In *Coyote Valley*, the plaintiffs (an individual Indian and three Indian tribes) argued that the Secretary of the Department of the Interior had delayed unreasonably calling Secretarial elections on their draft constitutions because the tribes had not incorporated the Bureau of Indian Affairs' suggested modifications into the draft constitutions. The Secretary had notified the tribes that he objected to the substance of the amendments and planned to disapprove them if ratified and asked that the tribes alter the objectionable provisions. When the tribes refused to modify their proposed constitutions, the Secretary refused to call the election. The court noted, "Under the current challenged procedure, defendants can delay the tribal reorganization process *indefinitely* simply by holding the draft constitution hostage and requiring modifications to be made prior to releasing it for elections.... It would be an understatement

to say that defendants' current procedure is antithetical both to the spirit of the IRA and to traditional notions of meaningful self-government." *Id.* at 173 (Emphasis in original). After reviewing the language of 25 U.S.C. § 476, the legislative history and administrative regulations, the court concluded that "the Secretary has a mandatory duty to call elections [within a reasonable period of time] upon a request from an eligible tribe." *Id.* at 175. In *Coyote Valley*, the district court specified how the Indian Reorganization Act could be improved, stating that "there is an obvious need for *some* guidelines, whether in the form of regulations or an informal handbook, which set forth a general framework for the constitutional review procedure and a reasonable time period within which the review process is to be completed." *Id.* at 173–74 (Emphasis in original) (noting that "one of the major objectives of the legislation was to curb administrative absolutism").

In response to *Coyote Valley*, Congress amended the Indian Reorganization Act, 25 U.S.C. § 476, in 1988. *See* Timothy Joranko & Mark Van Norman, *Indian Self–Determination at Bay: Secretarial Authority to Disapprove Tribal Constitutional Amendments*, 29 Gonz. L.Rev. 81, 96 (1993/1994). Congress amended § 476 to include a timetable for the calling of an election, *see* § 476(c), including a process by which the Secretary could "review the final draft of the constitution and bylaws, or amendments thereto to determine if any provision therein is contrary to applicable laws." § 476(c)(2). The 1988 amendments impose a mandatory duty on the Secretary to approve the proposals "within forty-five days after the election unless the Secretary finds that the proposed constitution and bylaws or any amendments are contrary to applicable laws." § 476(d)(1). In this case, the parties agree that the amendments voted on in the February 1992 Secretarial election are not contrary to applicable laws. No challenges were made to the eligibility of individual registered voters after the list was posted; however, the day before the election, Tribal Governing Board Chairman Gaiashkibos raised concerns about the registration procedures and the allowance of absentee voting. Although Gaiashkibos and Baker did contest the election results within 3 days of the election, pursuant to 25 C.F.R. § 81.22, their challenges were rejected and the amendments were approved nine days after the election and again twenty-three days after the election pursuant to 25 U.S.C. § 476(d)(1). The objections Gaiashkibos filed in April 1992 were well beyond the 3 day window under § 81.22 and the 45 day limit under § 476(d). Moreover, the bureau determined that Gaiashkibos's challenges were not valid and recognized that "the timeframe for contesting the results in 25 C.F.R. Part 81, is very specific; at best [Gaiashkibos's complaints] are moot."

Because the Secretary had addressed the timely challenges to the election and had approved the amendments within the 45–day time frame, the issue before the court is whether it was appropriate for Matheson to revoke approval of the amendments eight months after the election because of his determination that the wrong class of voters was allowed to vote in the election. Defendants argue that Matheson's action did not violate the Indian Reorganization Act or the Administrative Procedure Act because the Indian Reorganization Act is silent as to what the Secretary can do if he or she discovers a fundamental flaw in the election results *after* the election has been approved. In support of this position, defendants point to the Court of Appeals for the Eighth Circuit's decision in *Shakopee Mdewakan-*

*ton Sioux (Dakota) Community v. Babbitt,* 107 F.3d 667 (8th Cir.1997).

In *Shakopee,* 107 F.3d 667, the plaintiff (a federally recognized Indian tribe) brought a challenge under the Indian Reorganization Act and the Administrative Procedure Act following a Secretarial election to amend its tribal constitution. After the plaintiff tribe provided the Bureau of Indian Affairs with the names of individuals that it recognized as adult tribal members entitled to vote in the election, the election board rejected challenges to certain individuals but removed other individuals from the list after determining that they did not meet the tribe's constitutional membership requirement of ¼ Mdewakanton blood lineage. *Id.* at 667. The Secretary then conducted the election and the election board certified the results. *Id.* Pursuant to 25 C.F.R. § 81.22, several tribe members filed additional eligibility challenges. *Id.* Forty-three days after the election, the Secretary issued a decision letter, "stating that he could not approve the election's results because the possible errors in the voter-eligibility determinations raised substantial doubt regarding the election's fundamental integrity and fairness." *Id.* at 669–70. The Secretary deferred to the election board's decision on some of the challenges, ordered an administrative law judge to decide the eligibility of the remaining individuals and stated that there would be a new election once the voter eligibility issues were resolved. *Id.* at 670.

The plaintiff tribe argued that the court of appeals should approve the amended constitution because the Secretary had not acted within the time limits provided by § 476(d) for review of voter eligibility. The tribe also argued that the Secretary lacked the authority to review the determinations of voter eligibility because Congress had delegated the authority to make

the final determinations to the election board. The court of appeals concluded that it was reasonable for the Secretary to interpret the Indian Reorganization Act and its implementing regulations as allowing the Secretary to reject election results when it could not be determined whether they had been ratified by a majority of the tribe's voting members. *See id.* at 670. The court of appeals then examined the language of 25 C.F.R. § 81.13, which states that the election board's eligibility determinations and challenges to such determinations "shall be final," and 25 C.F.R. § 81.22, which allows the Secretary to order a new election. *See id.* at 671. The court held that the Secretary had discretion to review eligibility determinations after deciding that it was reasonable for the Secretary to interpret the word "final" to mean "final as to who casts a ballot but not as to whether the balloting amounts to a valid election by the Community's qualified voters." *Id.*

The Eighth Circuit noted its uncertainty as to the correctness of the Secretary's interpretation, stating, "Although we believe that the election board's composition was a carefully constructed regulatory compromise between federal and tribal sovereignty, and that perhaps a more reasonable interpretation of § 81.13 would be that it precludes Secretarial review of the board's eligibility determinations, [the court] may not substitute [its] interpretation for that of the Secretary." *Id.* The court's misgivings about the agency's decision were articulated by Judge Heaney in a dissent. *See id.* at 671–74. Judge Heaney echoed the words of criticism of the Bureau of Indian Affairs voiced by the court in *Coyote Valley,* stating "the agency's interpretation has the effect of indefinitely postponing the election to amend the Community's constitution which contravenes Congress' expressed intent that Secretarial elections proceed within the strict

time lines set forth in 25 U.S.C. § 476." *Id.* at 672 (Heaney, J., dissenting).

Despite defendants' reliance on *Shakopee,* I am not convinced that the decision stands for the broad proposition that the Secretary is free to act outside the confines of the IRA's statutory framework if there is or may have been a fundamental flaw in the election. Regardless of the breadth of the holding, *Shakopee* is distinguishable from the present case on its facts: in *Shakopee,* the Secretary disapproved the election within the 45–day time frame set forth by § 476(d), whereas in this case the Secretary had approved the election within the 45–day time frame, an approval which then Deputy Commissioner of the Bureau of Indian Affairs Matheson *revoked* eight months after the election.

Congress promulgated the deadlines outlined in the 1988 amendments to limit the discretionary authority of the Secretary but allowed the Secretary to retain broad discretion to review the constitution, constitutional amendments and voter eligibility issues within the 45–day review period. *See* 25 U.S.C. § 476(d)(1); 25 C.F.R. § 81.22. Defendants contend that they had a duty to revoke approval of the election in order to protect the tribal members' constitutional right to vote without dilution of the weight of their vote, even though it was outside the 45 day review period. *See Reynolds v. Sims,* 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (holding that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise"). Defendants' interpretation that there are exceptions to the time frame "runs counter to the balance carefully struck by Congress." *Shakopee,* 107 F.3d at 674 (Heaney, J., dissenting). *See also* Noreen Lennon, *Department of Interior Authorized To Review 'Final' Decisions of Tribal Election Board and To Invalidate Tribal Election Based on Eligibility Disputes in Shakopee Mdewakanton Sioux (Dakota) Community v. Babbitt,* 31 Creighton L.Rev. 527, 560 (1998) (arguing that Eighth Circuit inserted ambiguity into regulation's plain language, ignored legislative history of the IRA, expanded scope of Secretary's authority to interfere with tribal self-government and failed to recognize Indian canon of statutory construction favoring interpretation that benefits sovereign tribal interests).

Amicus curiae Tribal Governing Board argues that the 45 day review period was not triggered until October 7, 1992, the date Matheson issued his decision, because the February 1 election was not a proper election under § 476(a). Although this is a creative argument, such an interpretation of § 476(b) eviscerates the intended limited role of the government in Secretarial elections. Without mechanisms in place to assure the finality of the tribal election process, Indian tribes will never be able to rely on their election results.

As Judge Heaney noted in *Shakopee,* 107 F.3d at 674 (Heaney, J., dissenting), "Perhaps the most troubling aspect of this case is the practical result of the Secretary's decision." In *Shakopee,* almost two years had gone by with no resolution of the tribe's efforts to modify its membership requirements. In this case, over nine years have passed since the election and the amendments have not been implemented or revoked by the tribe. I conclude that defendants' decision to revoke the Secretary's prior approval of the LCO's constitutional amendments violated the statutory framework of the Indian Reorganization Act and ran afoul of their decision making authority under the Administrative Procedure Act.

### C. *Validity of the Matheson Letter*

■ Matheson determined that the wrong class voted in the 1992 election, that the appropriate class would have been the class that had voted to adopt LCO's tribal constitution in 1966 ("adult Indians residing on the reservation and nonresident members of ½ degree or more") and that the appropriate class would vote in future elections. *See* Dfts.' Br. Supp. M. Sum. J., dkt. # 98, at 12 (stating that defendants are ready to conduct new election on amendments, "as long as the election is limited to the correct class of voters, i.e., adult LCO members residing on the reservation and nonresident members having ½ or more LCO blood quantum"). Defendants' view is that Matheson was correct: the discrepancy in the class of voters in the 1992 election was a fundamental flaw because the majority of those who voted lived off the reservation but did not possess at least one half Indian blood. For their part, plaintiffs argue that Matheson erred in determining the definition of the correct class of voters because he relied on the language of the Indian Reorganization Act before it had been amended in 1988, *see* 25 U.S.C. § 476(a) and 25 C.F.R. § 81.6(d), as well as case law that had interpreted the pre 1988 version of the Act and he ignored LCO voter history under which tribal members who were 18 years old had been allowed to vote for 30 years. (The parties also disagree whether the 1988 amendments to the Indian Reorganization Act changed the definition of "Indian," *see, e.g.,* 25 C.F.R. § 81.1(i), but it is unclear how this definition is relevant to the determination whether Matheson erred in his interpretation.)

In Matheson's letter, he cites two cases: *The Confederated Salish and Kootenai Tribes of the Flathead Reservation, Montana v. Morton,* Case No. 2357, unpublished (D.Mont. Dec. 17, 1973), and *Cheyenne River Sioux Tribe v. Andrus,* 566 F.2d 1085 (8th Cir.1977). At the time both cases were decided (and before the act was amended in 1988), § 16 of the Indian Reorganization Act stated,

> Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, which shall become effective when ratified by a majority vote of the adult members of the tribe ... at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe. Such constitution and bylaws, when ratified as aforesaid and approved by the Secretary of Interior, *shall be revocable by an election open to the same voters and conducted in the same manner as hereinabove provided. Amendments to the constitution and bylaws may be ratified and approved by the Secretary in the same manner as the original constitution and bylaws.*

48 Stat. 984 (Emphasis added).

In the *Flathead* case, the plaintiffs sought to "enjoin defendants from permitting permanent off-Reservation members of the Tribes from voting in an election to amend the tribal constitution and bylaws to grant resident members 18 to 21 years of age the right to vote in tribal elections, and for a judgment declaring that in elections to amend the tribal constitution and bylaws only members who are residents of the Flathead Reservation are entitled to vote." *Id.,* slip op. at 1. Referring to § 16, the court stated that "the determination of whether nonresidents of the Flathead Reservation may vote depends upon whether the Tribes were originally organized as members of tribes (nonresident voting allowed) or as residents of a single reservation (nonresident voting not allowed)." *Id.,* slip op. at 6. After examining the

evidence, the court concluded that the plaintiffs had demonstrated that permanent nonresidents of the Flathead Reservation had not been permitted to vote at the election in which the tribal constitution and bylaws were adopted and therefore, only tribal members residing permanently on the reservation were entitled to vote in the election to amend the tribal constitution. *Id.*, slip op. at 12.

In *Cheyenne River*, 566 F.2d 1085, the plaintiff tribe sued officials of the Bureau of Indian Affairs, contending that the tribal constitution had primacy over the federal constitution in determining the age limitation on the right to vote in an election to amend the tribal constitution. The Court of Appeals for the Eighth Circuit disagreed, stating, "In view of the self-executing nature of the twenty-sixth amendment there can be no reasonable doubt that the Secretary had complete authority, indeed a mandate, to recognize the age of 18 years as the eligible voting age for adult Indians with respect to the adoption of a tribal constitution." *Id.* at 1089. The court noted that even though § 16 of the IRA requires that constitutions be amended "in the same manner as the original constitution and bylaws," the Secretary could adjust the voting age of the adult members from 21 to 18 without changing the meaning of that requirement. *Id.*

Since the entry of the decisions in *Flathead* and *Cheyenne River*, Congress has amended the relevant section of the Indian Reorganization to state,

> Any Indian tribe shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, and any amendments thereto, which shall become effective when—
> (1) ratified by a majority vote of the adult members of the tribe or tribes at a special election authorized and called by the Secretary under such rules and reg-

ulations as the Secretary may prescribe....

25 U.S.C. § 476(a). Significantly, Congress deleted the sentence upon which the courts in *Flathead* and *Cheyenne River* relied that stated, "Amendments to the constitution and bylaws may be ratified and approved by the Secretary in the same manner as the original constitution and bylaws."

Defendants contend that this deletion is not significant because of the language of § 476(b), which governs revocation of constitutions or bylaws. Section 476(b) states that "Any constitution or bylaws ratified and approved by the Secretary shall be revocable by an election open to the same voters and conducted in the same manner as provided in subsection (a) of this section for the adoption of a constitution or bylaws." Defendants are mistaken in reading § 476(b) to say that revocation elections need to be conducted in the same manner as the election adopting the original constitution; § 476(b) refers back to the requirements for adopting a constitution or amendment pursuant to § 476(a) in setting forth the requirements for the conduct of revocation elections. Defendants also argue that the deletion of the last sentence of § 16 is not significant because of the absence of legislative history suggesting that Congress intended to change the makeup of the class of voters in tribal elections. Defendants have not pointed to any legislative history indicating that Congress meant the statute would stay the same even after it deleted the words in the last sentence. Ordinarily, deletion of the words conveying a certain meaning changes the meaning. Moreover, when the language is not ambiguous, there need not be legislative history to indicate that Congress intended to do what it did.

Defendants also point to the Indian Reorganization Act's implementing regula-

tions in support of Matheson's decision. 25 C.F.R. § 81.6(d) provides, "For a reorganized tribe to amend its constitution and bylaws, only members who have duly registered shall be entitled to vote; provided, that registration is open to the same class of voters that was entitled to vote in the Secretarial election that effected its reorganization, *unless the amendment article of the existing constitution provides otherwise."* (Emphasis added). The LCO amendment article (article IX) provides that the constitution may be amended by a "majority vote of the qualified voters of the Band voting at an election called for that purpose by the Secretary of the Interior, provided at least 30 percent of those entitled to vote shall vote in such election." The LCO Constitution defines "qualified voter" as "members of the Band eighteen (18) years of age or over." By allowing tribal members who were at least 18 years old to vote in the 1992 Secretarial election, the tribe abided by the requirements of 25 U.S.C. § 476(a), 25 C.F.R. § 81.6 and Article IX of the LCO Constitution.

Defendants contend that Matheson's decision should be upheld under the Administrative Procedure Act because he provided a detailed and well-reasoned explanation for his decision to revoke the prior approval of the February 1, 1992 election results. In support of their argument, defendants cite the United States District Court for the District of Columbia's decision in *Ransom,* 69 F.Supp.2d 141. A brief summary of the facts of *Ransom* is necessary to allow for a comparison to the present case. After operating under a Three Chief System of government for almost two hundred years, the Saint Regis Mohawk Tribe conducted a referendum election to determine whether to adopt a tribal constitution with a three branch system (executive, judicial and legislative). *Id.* at 143. Following the election, there was a dispute within the tribe whether a sufficient majority of the tribe had voted in favor of the referendum. The tribe held additional referendum elections, the results of which indicated that the majority of the tribe believed that the original referendum had been certified improperly and that the new constitution lacked legal authority. Although the tribe had selected leaders for the Three Chiefs System, the Bureau of Indian Affairs continued to support the new constitution, recognize the three-branch government and provide federal funds to the new government only. The three elected chiefs brought suit against United States officials under the Administrative Procedures Act, alleging that the defendants had refused wrongfully to recognize them as the tribe's legitimate government leaders. The district court held that the Bureau of Indian Affairs and Interior Board of Indian Appeals had "acted arbitrarily, capriciously, and contrary to law in refusing to review for themselves the intensely disputed tribal procedures surrounding the adoption of a tribal constitution, in crediting unreasonable decisions of a seemingly invalid tribal court, and in refusing to grant official recognition to the clear will of the Tribe's people with regard to their government." *Id.* at 143.

Defendants argue that their conduct in this case is entirely different from that criticized in *Ransom.* They maintain that their actions have all been taken in compliance with the will of the tribe as expressed by the tribal governing board. Defendants' effort to use *Ransom* to shore up their actions is misplaced. The election at issue in *Ransom* was a tribal referendum, not a Secretarial election, which is a federal election conducted pursuant to § 476. 25 C.F.R. § 81.1(s) defines a "Secretarial election" as "an election held within a tribe pursuant to regulations prescribed by Federal Statute" and distinguishes Secretarial elections from tribal elections, which are

elections "conducted under tribal authority." The District Court for the District of Columbia's review of the propriety of the agency's action in a tribal election in *Ransom* does not inform this court's analysis of the agency's oversight in a Secretarial election. The Secretary's role in overseeing a Secretarial election cannot be analogized to the Secretary's decision whether to honor the results of a tribal referendum in light of Congress's clear guidance in defining the Secretary's role in holding Secretarial elections and approving the results and its lack of involvement in tribal elections. A comparison to *Ransom* would be useful if the LCO tribal governing board were seeking relief against defendants for their failure to recognize the results of a referendum, such as the one held on April 29, 2000, an unlikely hypothetical since the tribe voted again in favor of lineal descendancy over a blood quantum requirement for determining LCO membership, a result disfavored by both the governing board and defendants.

I find it puzzling that defendants would cite *Ransom*, a case in which the court not only found that the defendants had violated the Administrative Procedure Act, but also criticized the Bureau of Indian Affairs extensively, stating

> Defendants' rhetoric endorsing the principles of self government and tribal sovereignty ultimately rings hollow here. The essence of tribal self-determination is the Tribe's ability to choose for itself how its government will operate. For Defendants to refuse to acknowledge that choice because they disagree with it, or to actively seek to institute the form of government that they prefer, turns that notion on its head. Defendants' repeated refusal to recognize the Tribe's earnest efforts to undo its contentious certification of the Constitution, couched in the language of respect for

tribal sovereignty, is disingenuous at best.

*Id.* at 155. Defendants miss the mark in their attempt to differentiate their conduct in this case from the defendants' conduct in *Ransom*. In fact, the situations share one central flaw: "defendants' conduct directly violates the principles of tribal sovereignty that guide federal-Indian relations." *Id.* at 153. In *Ransom*, the Bureau of Indian Affairs' actions stemmed from its preference for a three-branch constitutional form of government for the Saint Regis Mohawk Tribe. In this case, it appears that the bureau's revocation of its approval of the amendments stemmed from its concern that the Lac Courte Oreilles Band of Lake Superior Chippewa Indians was expanding its membership in a way that created the possibility that "the courts or Congress may well decide that a tribe has so diluted the relationship between a tribal government and its members that it has 'self-determined' its sovereignty away." Pltfs.' Br., dkt. # 21, App. 1, Matheson ltr., at 8. The bureau cannot be guided by the results it favors in its relationship with Indian tribes, especially when its role is as carefully proscribed as it is in Secretarial elections. I conclude that Matheson's decision that the appropriate class of voters in Secretarial elections is the class that voted in the 1966 election was arbitrary and capricious under the Administrative Procedure Act. Not only did Matheson cite the pre 1988 version of Section 16 of the Indian Reorganization Act and rely on cases interpreting the unamended version of the act, he also failed to acknowledge that Congress had amended the act since its passage in 1934.

### D. *Plaintiffs' Constitutional Arguments*

Plaintiffs contend that Matheson's decision was arbitrary and capricious under the Administrative Procedure Act because

it violated the Fifth, Ninth, Fifteenth and Twenty Sixth Amendments to the United States Constitution. Because I conclude that Matheson's decision was invalid under the Administrative Procedure Act on other grounds, I need not reach plaintiffs' constitutional arguments.

### E. *Breach of Trust*

Plaintiffs seek monetary damages, arguing that defendants breached the general trust relationship between the United States and the Indian people by revoking their approval of the 1992 election results and by failing to hold a replacement election. Plaintiffs contend that the United States waived its sovereign immunity by allowing suits to be brought in federal court to enforce § 476. *See* 25 U.S.C. § 476(d)(2). Defendants argue in response that the government's role in Secretarial elections under the Indian Reorganization Act does not give rise to a trust relationship for which they can be subject to monetary damages.

In contrast to plaintiffs' request for injunctive and declaratory relief under the Indian Reorganization Act, *see* 25 U.S.C. § 476(d)(2), and the Administrative Procedure Act, 5 U.S.C. § 702, ("An action in a court of the United States seeking relief other than money damages ... shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party."), plaintiffs' request for monetary damages for violations of the trust relationship raises sovereign immunity problems. Under § 476(d)(2), Congress waived the United States' sovereign immunity and consented to suit for actions to enforce the act's provisions in federal district courts, but the act does not specify that the United States is subject to suit for monetary damages. "It is elementary that when consent to sue the United States is granted, the precise terms, conditions, and qualifications of such consent must be scrupulously followed." *Coleman v. United States Bureau of Indian Affairs*, 715 F.2d 1156, 1161 (7th Cir.1983). "[A] court must inquire whether the source of substantive law can be fairly interpreted as mandating compensation by the Federal Government for the damages sustained." *United States v. Mitchell*, 463 U.S. 206, 218, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). *See also United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) ("A waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.' ").

In *Mitchell (II)*, 463 U.S. 206, 103 S.Ct. 2961, the Supreme Court discussed the trust relationship between Indian tribes and the United States in an action for monetary relief. Specifically, the court addressed the issue whether the "United States is accountable in money damages for alleged breaches of trust in connection with its management of forest resources on allotted lands of the Quinault Indian Reservation." *Id.* at 207, 103 S.Ct. 2961. The plaintiffs were individuals owning interests in allotted lands on the Quinault Indian Reservation, an unincorporated association of such allottees and the Quinault Tribe, all of whom sued the United States in the Court of Claims to recover damages for the government's alleged mismanagement of timber lands on the reservation. *See id.* at 210, 103 S.Ct. 2961. The Court held that "a fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and property belonging to Indians" and that a breach of that duty subjects the government to money damages. *Id.* at 225, 103 S.Ct. 2961. *See also Brown v. United States*, 42 Fed. Cl. 538, 551 (Fed. Cl.1998) (stating that in order for Indians to sue United States for breaching its fiduciary duties by mismanaging lease under

which government operated golf course on Indian land, "the lessors must point to a statute or regulation that imposes a clear duty on the Secretary"). The Court noted that "[a]ll of the necessary elements of a common-law trust are present: a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds)." *Mitchell (II),* 463 U.S. at 225, 103 S.Ct. 2961.

■ Plaintiffs contend that the trust corpus in this case is "in managing the organization of an IRA tribal government which includes all of the tangible and intangible, real and personal property rights of a tribe and its members, including any health, education, housing, or other benefits to which the tribe and its members become entitled because of the IRA status, as well as the aggregate of rights which are guaranteed and are to be protected by the government." Plts.' Supp. Br. Sum. J., dkt. # 21, at 72. Plaintiffs have failed to point to a case in which the United States has been held liable for money damages for breach of its trust relationship with the Indians absent a fiduciary duty. Because I am not persuaded that § 476 of the Indian Reorganization Act imposes fiduciary obligations on the United States as a trustee or that it provides for a damages remedy against the United States for breach of these obligations, defendants' motion for summary judgment will be granted as to this claim. Because I conclude that defendants have not violated a trust relationship regarding their involvement with the 1992 Secretarial election, I need not address the parties' disagreement whether the trust obligation is owed to the class of persons who organized originally to establish the constitutional form of government or to those individuals who want to become members of the reservation community.

## ORDER

IT IS ORDERED that

1. The renewed motion for summary judgment filed by plaintiffs Sandra Thomas, Tina Thomas, Robert Sander, Estate of Michael Nalewaja, by his personal representative Beverly Nalewaja is GRANTED as to plaintiffs' claims under the Indian Reorganization Act and the Administrative Procedure Act and DENIED as to plaintiffs' claim that defendants breached a trust relationship.

2. The renewed motion for summary judgment filed by defendants United States; U.S. Department of Interior, Bureau of Indian Affairs, Gale Norton, Secretary of Interior, in her officials capacity; and M. Sharon Blackwell, Deputy Commissioner of the Bureau of Indian Affairs, in her official capacity is DENIED on all claims except the motion is GRANTED as to plaintiffs' claim that defendants breached a trust relationship. Defendants' motion to supplement their summary judgment materials is GRANTED.

3. The clerk of court is directed to enter judgment for plaintiffs and close this case.